IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

RONALD ANTHONY,                        )          CASE NO. 5:13CV00230
                                       )
                  Plaintiff,           )
                                       )
        v.                             )          MAGISTRATE JUDGE
                                       )          KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL,                )
SECURITY ADMINISTRATION,[1]            )
                                       )          **MEMORANDUM OPINION & ORDER**
                  Defendant.           )


        Plaintiff Ronald Anthony ("Plaintiff" or "Anthony") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his Social

Security Disability Insurance Benefits ("DIB").  Doc. 9, p. 2.  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate

Judge pursuant to the consent of the parties.  Doc. 13.

        For the reasons stated below, the Commissioner's decision should be **AFFIRMED**.


## I.  Procedural History

        Anthony protectively filed[2] an application for DIB on November 3, 2009, alleging a

disability onset date of April 16, 2005.[3]  Tr. 152.  Anthony alleged disability based on vision

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013. Pursuant to FED. R. CIV. P. 25(d), she is hereby substituted for Michael J. Astrue as the Defendant in this case.

[2] Protective filing is a Social Security term for the first time you contact the Social Security Administration to file a claim for disability or retirement. Protective filing dates may allow an individual to have an earlier application date than the actual signed application date. This is important because protective filing often affects the entitlement date for disability and retirement beneficiaries along with their dependents. http://www.ssdrc.com/disabilityquestionsmain20.html (Last visited 3/05/14).

problems.  Tr. 165.  His application was denied by the state agency initially and on

reconsideration (Tr. 85-86).  On October 12, 2011, a hearing was held before Administrative

Law Judge  ("ALJ") M.S. Kidd.  Tr. 28-70.

      In his October 21, 2011, decision, the ALJ determined that Plaintiff's residual functional

capacity ("RFC") did not prevent him from performing work existing in significant numbers in

the national economy, i.e., he was not disabled.  Tr. 6-26.  Anthony requested review of the

ALJ's decision by the Appeals Council. Tr. 5.  On December 17, 2012, the Appeals Council

denied Anthony's request for review, making the ALJ's decision the final decision of the

Commissioner.  Tr. 1-4.

## II. Evidence

### A.  Personal and Vocational Evidence

      Anthony was 50 years old at the time of his date last insured (March 31, 2010).  Tr. 11,

19.  He graduated high school, attended two years or college, and had past relevant work as a

packer.  Tr. 19, 63, 172.  Anthony stated that he stopped working in April 2005 because he could

not see well enough to do his job.  Tr. 165.

### B.  Relevant Medical Evidence[4]

### 1.     Treating sources  – Physical Impairments

      In November 2005, Anthony's eye doctor referred him to Todd Fladden, M.D., for a

consultation regarding his photosensitivity.  Tr. 243-44.   Dr. Fladen's impression was non-

---

[3] During the administrative hearing, Anthony moved to amend his onset date to February 25, 2009, but the ALJ
found that because Anthony was not disabled, the motion was moot.  Tr. 9, 38-39.

[4] Plaintiff only challenges the ALJ's findings with respect to his vision problems and mental impairments.
Accordingly, only the medical evidence relating to those claims is summarized herein.

specific ocular photosensitivity and questionable dry eye syndrome.  Tr. 243. He felt Plaintiff could have an inflammatory component secondary to dry eyes.  Id.  In April 2006, Dr. Fladen wrote to Aultman Hospital requesting approval for Plaintiff to get a second opinion regarding his eye impairment.  Tr. 241-42.  Dr. Fladen noted that topical cortical steroids, punctual plugs for stasis, and Voltaren[5] had not been effective in treating Plaintiff's bilateral dry eye syndrome.  Tr. 241.  His most recent March 2006 examination revealed 20/40 visual acuity for each eye; inferior punctate staining bilaterally; and punctual occlusion in the lower eye lids.  Tr. 241.  Dr. Fladen requested that Plaintiff receive a consultation at either the University Hospital of Cleveland or the Cleveland Clinic by a corneal specialist.  Tr. 241.

On April 25, 2008, Anthony visited North Canton Medical Foundation reporting a seasonal allergy flare up causing eye itching, watering eyes, sneezing, and some wheezing.  Tr. 320.

In February 2010, Dr. Fladen completed a report for the state agency.  Tr. 252-56.  He noted Plaintiff's diagnoses included myopic degeneration of the retina, suspected glaucoma, nystagmus (rapid eye movements),[6] and dry eye syndrome.  Tr. 252, 256.  Plaintiff had 20/40 visual acuity in the right eye and 20/70 in the left eye; and abnormal visual fields.  Tr. 252, 256.  Dr. Fladen left blank the section of the report which asked him to "explain how the visual impairment…affects this individual's ability to perform work-related activities…"  Tr. 256.

---

[5] Voltaren:  trademark for the preparations of diclofenac sodium.  Diclofenac sodium:  "…applied topically to the conjunctiva to inhibit miosis during and to reduce ocular inflammation or photophobia after certain kinds of ophthalmic surgery…" *See* Dorland's Illustrated Medical Dictionary, 31st Edition, 2007, at pp. 512, 2070.

[6] *See* Dorland's Illustrated Medical Dictionary, 31st Edition, 2007, at p. 1307.

2.      **State Agency Opinions – Physical Impairments**

In March 2010, state agency medical consultant Leon Hughes opined that Anthony could perform light work that involved sitting about six hours a day and standing and/or walking about six hours a day.  Tr. 302.  Dr. Hughes opined that Anthony could not climb ladders, ropes, or scaffolds, and could only occasionally stoop and crouch. Tr. 303.  Due to Anthony's visual impairment, Dr. Hughes stated that Anthony could perform work that required no better than 20/40 visual acuity in his good eye and limited him from all exposure to hazards and even moderate exposure to fumes, odors, dusts, gases, and poor ventilation.  Tr. 304, 305.  Dr. Hughes found Anthony's subjective allegations only partially credible.  Tr. 306.

At the state agency's request, Maureen May, M.D., performed a consultative eye examination in September 2010.  Tr. 322-27.  She opined that Plaintiff had adequate vision to drive but should not work in unfamiliar surroundings and would have significant limitations with computer and reading vision.  Tr. 323.

State agency physician Paul Morton, M.D., assessed Anthony's physical impairments at the reconsideration level of administrative review on September 27, 2010.  Tr. 328-35. Dr. Morton concluded that Anthony could perform light work with standing and/or walking about six hours in a day and sitting about six hours in a day.  Tr. 329. He felt that Plaintiff should never climb ladders, ropes, or scaffolds; could only occasionally stoop and crouch; had limited visual acuity; and should avoid all exposure to hazards and even moderate exposure to fumes, odors, dusts, gases, poor ventilation, and wind.  Tr. 330-32.

3.      **Treating sources – Mental Impairments**

On January 28, 2009, Anthony presented to Dr. Pradeep Manudhane of Community Services of Stark County ("CSSC"), indicating that he had not been on his Lexapro recently due

to a missed appointment.  Tr. 268.  Dr. Manudhane stated that before Anthony ran out of his medicine he was doing quite well.  He stated that he was recently stressed due to the passing of his cousin and wife's uncle but that he and his wife went on a Caribbean cruise and enjoyed themselves.  Id.  Dr. Manudhane's diagnostic impression was "Major Depression, recurrent."  Id.

Anthony returned to Dr. Manudhane's office on June 17, 2009, reporting that he again ran out of his medication due to a missed appointment.  Tr. 267.  Anthony reported that he had been doing quite a bit worse without his medications than he was before he ran out.  Id.  Dr. Manudhane prescribed Anthony more Lexapro.  Id.   By September 2009 Anthony visited Dr. Manudhane and reported that things were going well but that he recently sustained back and nerve injury due to a car accident.  Tr. 265.  Dr. Manudhane found that Anthony was mildly depressed.  Id.

Anthony visited Dr. Mundahane in February, May, and September 2010.  Tr. 413-415.  Dr. Manudhane found Anthony to be "somewhat" or "mildly" depressed each time.  Id.  Anthony also stated on two occasions that he was satisfied with how the medications were working.  Id.  By February 2011, Dr. Manudhane found that Anthony did not exhibit any depression.  In April and September 2011, Anthony was found to be somewhat anxious and depressed.  Tr. 409-410.

### 4.      State Agency Opinions – Mental Impairments

Anthony presented for a consultative examination with Dr. John S. Quinn, Ph.D. on May 31, 2006.  Dr. Tr. 245-49.   Dr. Quinn stated that Anthony's concentration and memory were fair during the exam.  Tr. 247.  Dr. Quinn opined that Anthony suffers from moderate depression.  Id.  He further opined that Anthony was moderately limited in his ability to maintain concentration, persistence, and pace and withstand the stress and pressures associated with daily work.  Tr. 249.

Dr. Quinn opined that Anthony was only minimally limited in his ability to understand, remember, and follow instructions.  Tr. 249.

In February 2010, state agency psychologist Roseann Umana, Ph.D., reviewed the evidence of record and opined that, as to Anthony's mental impairments, his RFC should be limited to simple, repetitive tasks involving superficial interaction with co-workers and the public.  Tr. 299. In September 2010, at the reconsideration level of review, Tonnie Hoyle, Psy.D., reviewed the evidence and found no evidence that Anthony's depression had worsened.  Tr. 336. Accordingly, Dr. Hoyle affirmed Dr. Umana's mental RFC.

### C.  Relevant Testimonial Evidence

#### 1.    Anthony's Testimony

At the administrative hearing, Anthony was represented by counsel and testified that he last worked in 2005 as a packer.  Tr. 41-42.  Anthony testified that he has problems with dry eyes and is sensitive to light.  Tr. 47.   He also testified that he last renewed his driver's license in 2008 and drives occasionally.  Tr. 48.   He stated that he usually drives only five to seven miles but can read the stop signs and see the colors.  Tr. 55.

Anthony also testified that he has trouble with depression and takes Lexapro which is helping.  Tr. 52.  He stated that he is depressed due to his vision getting worse.  Tr. 53.

#### 2.    Vocational Expert's Testimony

Vocational Expert Ms. Smith ("VE") testified at the hearing.  Tr. 62-69.  The VE testified to the exertional and skill level of Jones' past work.  Tr. 63.  She indicated that Anthony's past work as a packer was medium and unskilled.  Id.  The ALJ then asked the VE to assume an individual of Anthony's age, education, and work experience who would be limited to light work and could never climb ladders, ropes, or scaffolds but could occasionally climb ramps

6

and stairs, stoop, and kneel.  Tr. 63.  The individual would also be limited to frequent far and

near acuity; no overhead reaching with the dominant right arm; and should not engage in any

employment that would require more than occasional reading; should not work with any small

parts; should avoid moderate exposure to fumes, odors, gases, poor ventilation; and should avoid

all exposure to hazards, such as unprotected heights, dangerous machines, commercial driving,

exposure to wind, dust, smoke, and irritating fumes.  Tr. 63.  The individual would be further

limited to work that is simple, routine; occasional interaction with others; no fast paced high-

production demands, such as in a piece work setting; and a static environment with infrequent

changes, and those changes would be explained.  Tr. 64.  The VE stated that such a hypothetical

individual would be unable to perform Anthony's past work but could perform work as a laundry

worker (2,500 local jobs, 30,000 state jobs, 900,000 nationally); cafeteria attendant (1,500 local

jobs, 16,000 state jobs, 400,000 nationally); and information clerk (3,000 local jobs, 35,000 state

jobs, 1 million nationally).  Tr. 64-65.

> The ALJ asked a second hypothetical where he added to the first hypothetical a limitation

that the job would not require any peripheral vision.  Tr. 65.  The VE testified that the cafeteria

attendant position may require peripheral vision.  Tr. 65.  The ALJ then asked if there was a third

job the VE could give that meets the first hypothetical requirements and also does not require

any peripheral vision.  Tr. 65.  The VE stated that the hypothetical individual could also work as

an office helper (1,000 local jobs, 3,000 state jobs, 100,000 national jobs).

> The ALJ then asked a third hypothetical which incorporated everything from the first and

second hypothetical but modified the work from light to sedentary.  Tr. 65.  The VE then stated

there would be no jobs for such an individual.  Tr. 66.  The ALJ then went back to the second

hypothetical but changed the visual acuity limitation from frequent far and near acuity to

occasional.  Tr. 66.  The VE testified that there would be no jobs for such an individual.  Tr. 66.

The ALJ then asked about the effect if the individual was off task 20 percent of the time.  Tr. 66.

The VE again stated there would be no jobs for such an individual. Tr. 66.


### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy . . . .

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must
   be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a
   severe impairment that has lasted or is expected to last for a continuous
   period of at least twelve months, and his impairment meets or equals a
   listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ
   must assess the claimant's residual functional capacity and use it to

determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920[7]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his October 21, 2011, decision, the ALJ made the following findings:

1.      The claimant last met the insured state requirements of the Social Security Act (the "Act") on March 31, 2010.  Tr. 11.

2.      The claimant did not engage in substantial gainful activity during the period from his alleged onset date of February 21, 2009, through his date last insured of March 31, 2010.  Tr. 11.

3.      Through the date last insured, the claimant has the following severe impairments:  blepharoconjunctivitis,[8] chronic dry eye syndrome, blurred vision, myopic degeneration, myofacial back pain, degenerative joint disease of the right shoulder and bilateral hips, and major depression.  Tr. 11.

---

[7] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[8] Blepharoconjunctivitis:  inflammation of the eyelids and conjunctiva.  *See* Dorland's Illustrated Medical Dictionary, 31st Edition, 2007, at p. 225.

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of the one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[9] Tr. 11-12.

5.      After careful consideration of the entire record…through the date last insured, the claimant had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404-1567(b) except that claimant may occasionally stoop, kneel, climb ramps and stairs, but never climb ladders, ropes, or scaffolds; the claimant is precluded from any reaching overhead with the dominant [right] upper extremity; the claimant must avoid even moderate exposure to fumes, dust, gas, odors, smoke, and poorly ventilated areas; the claimant must avoid all exposure to workplace hazards such as unprotected heights and dangerous moving machinery; the claimant is precluded from commercial driving; the claimant is precluded from exposure to wind; the claimant is limited to the performance of work tasks that are simple and routine, performed in a work environment free of fast pace (sic) production demands [such as found in assembly line work and piece-rate work], and which is static, involving frequent changes, with an opportunity for such changes as do occur to be explained, and which involves no more than occasional interaction with others.  Tr. 13.

6.      Through the date last insured, the claimant was unable to perform any past relevant work.  Tr. 19.

7.      The claimant was born [in 1959]…which is defined as a younger individual age 18-49, on the date last insured.  The claimant subsequently changed age category to closely approaching advanced age.  Tr. 19.

8.      The claimant has at least a high school education and is able to communicate in English.  Tr. 19.

9.      Transferability of job skills is not an issue in this case because claimant's past relevant work is unskilled.  Tr. 19.

10.     Through the date last insured, considering the claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the claimant could have performed. Tr. 19.

---

[9] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

11.     The claimant was not been under a disability, as defined in the Social Security Act, from February 21, 2009, the alleged onset date, through March 31, 2010, the date last insured.  Tr. 20.

The ALJ's decision became the final decision of the Acting Commissioner when the Appeals Council denied Anthony's required for review on December 17, 2010.  Tr. 1.

## V. Parties' Arguments

### A.      Plaintiff's Arguments

Anthony presents three issues for review.  First, he argues that the ALJ erred in relying on Dr. Quinn's consultative report in formulating his RFC.  Doc. 9, p. 13.  Next, Anthony contends that the ALJ failed to explain why he found only mild limitations in concentration, persistence, or pace despite giving Dr. Quinn's report, which found moderate limitations in this area, considerable weight.  Id. at p. 14.  Finally, Anthony argues that the ALJ failed to include in the RFC a limitation based on Anthony's photosensitivity.  Id. at p. 15.

### B.      Defendant's Arguments

In response, the Commissioner argues that the ALJ properly considered Dr. Quinn's opinion and any inconsistency between Dr. Quinn's opinion and the ALJ's decision is harmless error.  Doc. 10, p. 13, 16.  The Commissioner also contends that Anthony's eye limitations were properly accounted for in the RFC.  Id. at p. 17.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Secretary of Health and Human Services,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ appropriately weighed the opinion of Dr. Quinn

The ALJ gave considerable weight to the opinion of consultative examiner John F. Quinn, Ph.D. Tr. 18. Anthony argues that this weight was improper because Dr. Quinn's May 31, 2006, report was completed five years prior to the hearing decision and that records from Dr. Mundahane at CSSC from 2009 through 2011 indicate that Anthony's condition worsened after Dr. Quinn's report. Doc. 9, p. 13. Anthony also argues that the ALJ erred by failing to request a new psychological consultative exam. Doc. 9, p. 14. The Commissioner counters that the evidence from the CSSC providers do not support limitations beyond those assessed by Dr. Quinn or the ALJ in his RFC assessment and that it was unnecessary for the ALJ to order a second consultative exam. Doc. 10, p. 14-15.

### 1. CSCC records do not support Anthony's contention that his condition worsened after Dr. Quinn's report

Anthony appears to be arguing that the ALJ lacked the proper support in the record to assign considerable weight to Dr. Quinn's opinion because the CSSC records show that his condition worsened after Dr. Quinn's opinion. To support Anthony's contention that his condition worsened between Dr. Quinn's 2006 report and Anthony's 2009 through 2011 CSSC visits, he states that Dr. Quinn diagnosed him with major depressive disorder, single episode,

moderate (Tr. 248), while records from CSSC indicate a diagnosis of major depression, recurrent (Tr. 265-268, 409-415).  Doc. 9, p. 13.  The diagnoses from both Dr. Quinn and Dr. Mundahane are consistent with the ALJ's decision which found that Anthony suffers from major depressive disorder.   Thus, it appears the only difference between the two diagnoses is that Dr. Quinn found single episode depression, while Dr. Mundahane found recurrent depression.  However, this distinction does not appear to be significant and the ALJ clearly considered the CSSC records when rendering his decision.  See Tr. 17.

In addition, Dr. Mundahane frequently reported that Anthony was only "mildly" or "somewhat" depressed (Tr. 265, 410, 413-415) and, on one occasion in February 2011, reported that Anthony was "[n]ot exhibiting any depression at this time."  Tr. 411.  Dr. Manudhane reported that Anthony's symptoms worsened on only two occasions, both of which occurred when Anthony had run out of his medication due to missing appointments.  Tr. 267-268.  Dr. Mundahane did not offer an opinion that Anthony was incapable of work due to his mental health issues.  In fact, Anthony did not provide any opinion from Dr. Mundahane or any other mental health provider relevant to the assessment of the RFC.  Accordingly, Dr. Mundahane's records do not indicate a worsening of Anthony's condition from the date of Dr. Quinn's report.

### 2.  The ALJ did not err by not requesting a new psychological consultative examination

Anthony states that, because Dr. Mundahane did not provide opinion evidence and because Dr. Quinn's report was five years old, the ALJ erred by not requesting a new psychological examination.  Doc. 9, p. 14.  The Commissioner argues that it is entirely within the ALJ's discretion whether to order a consultative exam.  Doc. 10, p. 15; 20 C.F.R. § 404.1519(a) (states that the agency *may* order a consultative exam).  The Commissioner is correct. "[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant

13

him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination." *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009) *quoting Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir.1986). Accordingly, the ALJ was not required to request a new psychological consultative examination.

20 C.F.R. § 404.159(b) provides guidelines for when a situation *may* warrant a consultative exam:

> We may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim.

This passage reiterates that the ALJ has discretion whether or not to order a consultative exam. Here, the ALJ did not find a second consultative exam was necessary because he did not find an inconsistency in the medical evidence relating to Anthony's depression and found the evidence sufficient to render a decision. The ALJ specifically stated, "Mental status examinations included in the record have consistently reported normal results." Tr. 17. The ALJ then cited to various medical records including the CSSC records. Id. Accordingly, the ALJ did not err by not requesting a new psychological exam.

### B. Any inconsistency between the ALJ's decision and Dr. Quinn's report with regard to concentration, persistence, or pace is harmless

Next, Anthony argues that the ALJ failed to explain why he found Anthony mildly limited in concentration, persistence, or pace when the ALJ gave considerable weight to Dr. Quinn's report which found moderate limitations in this area. Doc. 9, p. 14. The Commissioner argues that any inconsistency was harmless because the ALJ accounted for Anthony's limitations in the RFC by restricting him to simple, routine work performed in an environment free of fast paced production demands and involving infrequent changes. Doc. 10, p. 17. Furthermore, the Commissioner points out that, although Dr. Quinn found a moderate limitation in concentration,

persistence, or pace, he observed that Anthony had normal concentration and attention during his examination by Dr. Quinn.  Id., Tr. 248.

In Step Three, the ALJ determined that Anthony had only mild difficulties with regard to concentration, persistence, or pace.  Tr. 12.  The ALJ stated, "[I]n session with [Dr. Quinn], the claimant was able to complete pre-examination forms without difficulty (B2F/1).  The claimant displayed intact memory, attention and concentration with normal limits and intellectual functioning in the average range."  Id.  When assessing the RFC, the ALJ accorded "considerable weight" to Dr. Quinn's opinion, including a finding that Anthony was "moderately impaired" with regard to concentration, persistence, or pace.  Tr. 18.  Even if Anthony was moderately impaired with regard to concentration, persistence, or pace, the ALJ's stating that Anthony was only mildly impaired in this area was harmless error.  First, even with a moderate limitation in concentration, persistence, or pace, Anthony still would fail to satisfy a Listing.[10]  Furthermore, the ALJ accounted for moderate limitations in concentration, persistence, or pace in the RFC by limiting Anthony to "work tasks that are simple and routine, performed in a work environment free of fast pace production demands [such as are found in assembly line work and piece-rate work], and which is static, involving infrequent changes, with the opportunity for such changes as do occur to be explained."  Tr. 13.  Accordingly, any error by the ALJ is harmless and no purpose would be served by remanding this matter for the ALJ to resolve this inconsistency.  *Branon v. Comm'r of Soc. Sec.*, 539 F. App'x 675, 679 (6th Cir. 2013) (finding error by the ALJ harmless and, therefore, not requiring reversal).

---

[10] To determine if Anthony met a Listing with regard to his mental impairment, the ALJ considered the "paragraph B" criteria which require at least two categories of *marked* difficulties or repeated episodes of decompensation.  Tr. 12.  "A marked limitation means more than moderate but less than extreme."  Id.  Accordingly, even if Anthony has a moderate limitation in concentration, persistence, or pace, he still would not satisfy the "paragraph B" criteria and thus, does not satisfy a Listing with regard to his mental impairment.

### C.  The RFC is supported by substantial evidence

Anthony's third and final argument is that the ALJ failed to account for his photosensitivity limitation in the RFC.  Doc. 9, p. 15.  The ALJ found that Anthony suffered from the following severe eye impairments:  blepharoconjunctivitis, chronic dry eye syndrome, blurred vision, and myopic degeneration.  Tr. 11.  That ALJ stated that, "these findings would be consistent with the claimant's allegations of…photosensitivity…[but] the record, when viewed as a whole, is not supportive of the allegation that the existence of these conditions is preclusive of all work."  Tr. 16.  The ALJ went on to say that, although Anthony claims he is hypersensitive to light, "the evidence indicates that, contemporaneously with the filing of this claim, he and his wife went on a Caribbean cruise, a potent source of…sunlight."  Tr. 18.  Accordingly, the ALJ found that Anthony's claim was not entirely reliable.  Tr. 18.  The ALJ also pointed out that Anthony is "non-compliant" with his prescription eye medications and "was able to renew his driver's license in 2008 and still drives 'when necessary.' "  Tr. 16.

The regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant medical and other evidence" of record. 20 C.F.R. §§ 404.1545(a); 404.1546(c); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 20)10) ("The Social Security Act instructs that the ALJ – not a physician – ultimately determines a Plaintiff's RFC"); *Poe v. Comm'r of Soc. Sec.*, 342 Fed.Appx. 149, 157 (6th Cir. 20)09) ("an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding").  A subjective assessment of pain symptoms is relevant to determining whether a claimant suffers from a disability but is not conclusive evidence establishing a disability.  *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir.2001) ("Subjective

complaints of 'pain or other symptoms shall not alone be conclusive evidence of disability.' ")
(quoting 42 U.S.C. § 423(d)(5)(A)). In evaluating the claimant's subjective complaints of pain an
administrative law judge may properly consider the claimant's credibility, and this Court is
required to accord great deference to that credibility determination. *See id.; Walters,* 127 F.3d
525, 531 (stating that an administrative law judge's "findings based on the credibility of the
applicant are to be accorded great weight and deference, particularly since an [administrative law
judge] is charged with the duty of observing a witness's demeanor and credibility."). *Warner v.
Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004).

Here, the ALJ accounted for limitations that are supported by the evidence.  In reliance
on VE testimony in response to a hypothetical question that contained limitations that the ALJ
found credible, the ALJ concluded that, based on that RFC, there was work that Anthony could
perform.  *See Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) ("[i]n order
for a vocational expert's testimony in response to a hypothetical question to serve as substantial
evidence . . . [the] [h]ypothetical questions . . .  need only incorporate those limitations which the
ALJ has accepted as credible") (internal citations and quotations omitted).  Thus, the ALJ's RFC
determination was supported by substantial evidence.

Alternatively, even if the RFC should have accounted for a photosensitivity limitation,
any error was harmless because all of the jobs identified by the VE (laundry worker, information
clerk, and officer helper) are performed indoors.  Tr. 64-65.

## VII.  Conclusion

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.


Dated:  March 18, 2014

_____
Kathleen B. Burke
United States Magistrate Judge